

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-21-00373-CV

———————————————

IN RE: THE COMMITMENT OF JACK ALLEN HALE, JR.

---

On Appeal from Criminal District Court No. 1
Tarrant County, Texas
Trial Court No. CDC1-S-14719-20

---

Before Sudderth, C.J.; Kerr and Wallach, JJ.
Memorandum Opinion by Justice Wallach

## MEMORANDUM OPINION

Jack Allen Hale Jr. appeals from a judgment of civil commitment. In his first and second issues, Hale claims that the trial court erroneously allowed the State's expert, Dr. Christine Reed, to testify. In his third and fourth issues, he complains that the trial court erred in excluding evidence related to his current parole. We hold that none of these issues present reversible error, and we affirm the judgment of the trial court.

## I.     BACKGROUND

In 1991, Hale pled guilty to indecency with a child and received a fifteen-year prison sentence. After serving six years, he was released on mandatory supervision.[1] He violated conditions of his mandatory supervision by possessing pornography and by getting involved with a woman who had a 12-year-old son.[2] He also began a relationship with G.S., who had four children including then-12-year-old A.S. After

---

[1]Under the statute in effect at the time Hale committed his 1991 offense, an eligible prisoner was automatically released when the actual time served plus accrued good conduct time added up to the maximum term to which he was sentenced. Act of May 23, 1987, 70th Leg., R.S., ch. 1101, § 7, sec. 8(c), 1987 Tex. Gen. Laws 3750, 3754 (repealed 1997); *Ex parte Geiken*, 28 S.W.3d 553, 555 (Tex. Crim. App. 2000).

[2]Dr. Reed testified that Hale was not allowed "to be around individuals under the age of 17" or "to be in a relationship with a woman that had children under the age of 17 because that would be a vulnerable victim." Hale testified that he could not have contact with children or become involved in a relationship with a woman who had children under 17 "without prior written permission" from his parole officer. Whichever the case, it was undisputed at trial that Hale committed violations and was sent back to prison in 1998.

being sent back to prison, Hale continued communicating with G.S. and A.S. G.S. and A.S. visited him in prison, and their family and Hale wrote letters back and forth during this time as well.

In 2002, Hale was again released from prison on mandatory supervision and moved into a halfway house. He continued to communicate with the family, including having daily phone conversations with A.S. He then moved back to the area where A.S. and her family lived. His communications with A.S. became increasingly sexual, and after she turned 16, they had sex in his car. G.S. later found nude photographs of Hale in A.S.'s dresser and reported Hale to the local sheriff's department, who then arrested him. Hale had also been keeping nude photographs of A.S. in his trailer. He returned to prison but still faced charges of sexual performance by a child, possession of child pornography, and sexual assault of a child under 17. In 2003, he pled guilty to one count of sexual performance by a child and one count of sexual assault of a child under 17 and was sentenced to 28 more years in prison.

On June 30, 2020, a parole panel recommended that Hale be released on parole pending his completion of a sex-offender treatment program. Hale completed that program, but on December 14, 2020, the State filed a petition to civilly commit him as a sexually violent predator (SVP). The State alleged that Hale was a repeat sexually violent offender and, based on an expert's clinical assessment in accordance with Section 841.023(a) of the Texas Health and Safety Code, suffered from a behavioral

3

abnormality that made him likely to engage in a predatory act of sexual violence.[3] *See* Tex. Health & Safety Code Ann. §§ 841.003, 841.023(a).

While Hale was still in prison, Dr. Reed interviewed him. Hale later deposed Dr. Reed and, after the deposition, filed a motion to exclude her testimony. The trial court denied his motion and allowed Dr. Reed to testify at trial. Hale was the only other witness who testified at his trial.

The jury found beyond a reasonable doubt that Hale is a sexually violent predator. The trial court ordered Hale committed until he is no longer likely to engage in predatory acts. This appeal followed.

## II. EVIDENCE AT TRIAL

Dr. Reed first testified at a hearing outside the jury's presence,[4] and the trial court ruled her testimony admissible. In front of the jury, Dr. Reed explained how she

---

[3]To civilly commit a person, the State must show that "the person: (1) is a repeat sexually violent offender; and (2) suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence." *See* Tex. Health & Safety Code Ann. §§ 841.003(a), .062(a). A person is a "repeat sexually violent offender" for the purposes of the SVP statute if the person is convicted of more than one sexually violent offense and a sentence is imposed for at least one of the offenses. *Id.* § 841.003(b). The statute defines "behavioral abnormality" as a "congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." *Id.* § 841.002(2).

[4]We will refer to this hearing as the *Daubert/Kelly* hearing. *See Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S. Ct. 2786 (1993); *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992).

evaluated Hale and the methodology she used. She testified that she used several measures—including the Hare Psychopathy Checklist, the Static-99, and the Risk for Sexual Violence Protocol (RSVP)—to aid in her evaluation.[5] She said that, in general, "the two major risk factors and most significant risk factors we see in these evaluations are sexual deviance and an antisocial orientation." She gave detailed testimony about his criminal, relationship, treatment, employment, and sexual history. Dr. Reed diagnosed Hale with unspecified paraphilic disorder and antisocial personality disorder. She explained that "unspecified paraphilic disorder" meant that Hale exhibited "some sort of sexual disorder" that "doesn't fit neatly into one of the other categories," and "an antisocial personality disorder is a longstanding pattern of violation of the rights of others and violation of social norms."

Dr. Reed opined that Hale has a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. When asked how she would characterize what "makes up" Hale's behavioral abnormality, she testified:

> It's the -- the combination of the sexual deviance, the proclivity to engage in these sexual behaviors that are illegal, that are problematic, that -- to be preoccupied with sexual activities, the combination of that, along with the psychopathic personality, and the willingness to manipulate others, to use others, to engage in illegal acts, to violate the rights of others. The combination of those things, I think is what makes him have a behavioral abnormality.

---

[5]We will explain these measures in detail in our discussion of Hale's first issue.

During his cross-examination of Dr. Reed, Hale asked the trial court for permission to question Dr. Reed about Hale's completing sex-offender treatment and "the fact that he cannot go on parole unless he completed the treatment," as well as other matters related to his current parole. The State objected on relevancy grounds to discussion about Hale's parole conditions "and how he might do" on parole. The trial court sustained the State's objection but permitted Hale to ask Dr. Reed about Hale completing the Sex Offender Treatment Program in connection with whether he suffers from a behavioral abnormality. Hale made an offer of proof with Dr. Reed outside the presence of the jury.

After Dr. Reed testified, the State called Hale as a witness. Hale also testified about his criminal, relationship, treatment, employment, and sexual history. He admitted to offending against A.S. and his first victim, N.D., although he maintained that he had not had any type of sexual contact with N.D. Even though he had been charged with and pled guilty to indecency with a child for fondling N.D.'s genitals, he testified that he had only exposed his penis to her and masturbated until he ejaculated. He admitted to the violations of his mandatory supervision in 1998: possession of pornography and having a relationship with a woman who had a 12-year-old son without prior written permission from his parole officer. Hale also admitted to the 2002 violation of his parole involving the nude pictures A.S. had of him. He testified that it was never his intention to exploit either N.D. or A.S.

Hale testified that he had completed a seventeen-month-long sex-offender-treatment program in the 1990s during his first stint in prison and, more recently, a nine-month-long sex-offender-treatment program that he finished just months before his trial. He believed that the second program was better than the first and that he could safely be around children. In addition to these two programs, Hale had also attended sex-offender treatment during both periods of his mandatory supervision. Hale testified that he did not believe he still needed sex-offender treatment.

Prison records from Hale's sexually violent offenses against N.D. and A.S. were admitted in evidence without objection, as was a worksheet Hale had completed as part of his most recent sex-offender-treatment program. The worksheet contained various questions and Hale's answers about the circumstances surrounding his offense against A.S., the offense itself, and the aftermath. Hale's only exhibit, offered and admitted for the record only, was paperwork from the Texas Board of Pardons and Paroles indicating the parole panel's decision to conditionally grant Hale parole and the special conditions that would be imposed on him. The jury found beyond a reasonable doubt that Hale is a sexually violent predator, and the trial court ordered him civilly committed in accordance with Section 841.081 of the Texas Health and Safety Code for treatment and supervision. *See* Tex. Health & Safety Code Ann. § 841.081(a).

### III. ADMISSION OF DR. REED'S TESTIMONY

In his first issue, Hale claims that Dr. Reed's opinion testimony should have been excluded because the State failed to carry its burden to show that the testimony was scientifically reliable. Hale argues that Reed's expert-opinion testimony was unreliable based on the United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993), the Texas Supreme Court's decision in *E.I. du Pont de Nemours and Co., Inc. v. Robinson*, 923 S.W.2d 549 (Tex. 1995), and the Texas Court of Criminal Appeals' decision in *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992).

### A. Hale Has Preserved this Issue for Our Review.

The State argues that Hale's first issue should be overruled because it was not properly preserved. To preserve a complaint for our review, the complaint on appeal must match that presented in the trial court. *In re J.C.*, 594 S.W.3d 466, 473 (Tex. App.—Fort Worth 2019, no pet.); *see Banda v. Garcia*, 955 S.W.2d 270, 272 (Tex. 1997). The State points out that Hale argues that Dr. Reed's opinion is not reliable, but in the trial court, Hale argued that she was not qualified. Hale did argue in the trial court that she was not qualified, but that is not all that he argued. In his "Motion to Exclude Testimony of Dr. Christine Reed," Hale made multiple arguments, including that "any testimony Dr. Reed might provide is unreliable." At the time of the civil-commitment trial, the trial court referred to "the motion that was filed back on July 7th of 2021" and said "we'll deny that motion *as it was filed*." [Emphasis added.]

8

The State's contention that "[t]he trial court understood Hale's argument to be that Dr. Reed was not qualified" is further belied by the record of the *Daubert/Kelly* hearing, at which the State itself said that it was "clear from [Dr. Reed's] testimony this morning that . . . the issue is not qualifications, but it goes to the weight of her testimony, not whether she's qualified to testify." The trial court responded, "Well, and ultimately . . . that may be the issue." Finally, at the conclusion of the hearing, the trial court found "that Dr. Reed is a qualified expert, that her testimony could be relevant and reliable," and "that her testimony and her opinion will be admissible." This is the ruling of which Hale complains on appeal. The State's waiver argument has no merit.

**B.     The State Met Its Burden at Trial to Show that Dr. Reed's Opinion Testimony was Scientifically Reliable.**

We review a trial court's rulings in admitting evidence for an abuse of discretion. *Fleming v. Wilson*, 610 S.W.3d 18, 21 (Tex. 2020). An appellate court must uphold the trial court's evidentiary ruling if the record shows any legitimate basis for the ruling. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998). A trial court abuses its discretion if it acts without reference to any guiding rules or principles—that is, if its act is arbitrary or unreasonable. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). An appellate court cannot conclude that a trial court abused its discretion merely because the

appellate court would have ruled differently in the same circumstances. *Robinson*, 923 S.W.2d at 558; *see also Low*, 221 S.W.3d at 620.

Rule 702 allows expert testimony when the witness is "qualified as an expert by knowledge, skill, experience, training, or education," and the witness's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Tex. R. Evid. 702. A trial court's discretion in determining whether an expert is qualified to testify on a matter is broad but not unbounded. *In re Commitment of Bohannan*, 388 S.W.3d 296, 307 (Tex. 2012). In *Daubert*, the United States Supreme Court held that the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability. 509 U.S. at 590, 113 S. Ct. at 2795. The Court clarified that, in a case involving scientific evidence, "*evidentiary reliability* will be based upon *scientific validity*." *Id.* at n.9 (emphasis in original).

To be considered reliable, evidence derived from a scientific theory must satisfy three criteria in any particular case: (a) the underlying scientific theory must be valid; (b) the technique applying the theory must be valid; and (c) the technique must have been properly applied on the occasion in question. *Kelly*, 824 S.W.2d at 573. Determining whether an expert's theory or technique is reliable requires consideration of all pertinent factors, including

(1) the extent to which the theory has been or can be tested;

10

(2) the extent to which the technique relies upon the subjective interpretation of the expert;

(3) whether the theory has been subjected to peer review and/or publication;

(4) the technique's potential rate of error;

(5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and

(6) the non-judicial uses which have been made of the theory or technique.

*Bohannan*, 388 S.W.3d at 305. These are the same factors the Texas Supreme Court listed in *Robinson*. 923 S.W.2d at 557. The *Robinson* Court further acknowledged that the factors a trial court will find helpful in determining whether the underlying theories and techniques of the proffered evidence are scientifically reliable "will differ with each particular case." *Id.* Thus, regardless of what factors are applied, the proponent of the expert testimony must prove that it is based upon a reliable foundation. *Gross v. Burt*, 149 S.W.3d 213, 238 (Tex. App.—Fort Worth 2004, pet. denied).

We have also recognized that "the criteria for assessing reliability will vary depending on the type of expert and the nature of the evidence." *Marvelli v. Alston*, 100 S.W.3d 460, 479 (Tex. App.—Fort Worth 2003, pet. denied). When faced with "non-scientific evidence" like Dr. Reed's testimony,[6] courts must analyze the

---

[6]In *In re D.S.*, we explained that the difference between "scientific" and "non-scientific" evidence "is that the former is based on the application of scientific

11

underlying data forming the basis for the expert's opinion. *D.S.*, 19 S.W.3d at 529. If the foundational data underlying an expert's opinion testimony are unreliable, then any opinion drawn from that data is likewise unreliable. *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex. 1997). "Further, an expert's testimony is unreliable even when the underlying data are sound if the expert draws conclusions from that data based on flawed methodology." *Id.*

Hale complains that Dr. Reed provided no scientific support for her claim that he is "sexually deviant" or for her claim that this is one of the "biggest" or is a "major" risk factor for reoffending. He likens Dr. Reed's testimony in this case to Dr. Richard Coons's expert testimony in *Coble v. State*, a death-penalty case in which the Court of Criminal Appeals concluded that the trial judge abused his discretion in admitting Dr. Coons's testimony concerning future dangerousness because the prosecution (the proponent of Dr. Coons's testimony) did not satisfy its burden of showing the scientific reliability of Dr. Coons's methodology for predicting future dangerousness. 330 S.W.3d 253, 279–80 (Tex. Crim. App. 2010). The State distinguishes *Coble* from Hale's case by pointing out that in *Coble* Dr. Coons admitted that his methodology was "idiosyncratic" and was one of his own creation. *Id.* at 277.

---

principles [that] can be readily tested by [the *Daubert/Kelly*] factors, while the latter is based on skill or on experience based on observation." 19 S.W.3d 525, 529 (Tex. App.—Fort Worth 2000, no pet.).

We interpret Hale's first point of error as arguing that both the underlying data *and* methodology on which Dr. Reed based her expert opinion are unreliable. Applying the standards from *Daubert*, *Kelly*, *Robinson*, and their progeny, we see little merit to his argument about the data. In her deposition,[7] Dr. Reed explained her evaluation of Hale. She testified that she used the PCL-R, the Static-99, and the RSVP to come up with her opinion.[8] She said that all these instruments have been researched and peer-reviewed, as have the guidelines on how to use and interpret them. She explained that the PCL-R is the "Harris [sic] Psychopathy checklist," and its purpose is "[t]o get a measure of psychopathy or psychopathic traits." Hale's counsel himself acknowledged during the deposition that the Static-99 was "a piece of peer-reviewed documentation -- that has been a gold standard in psychology for a very long time -- that is scored, and scored properly." Dr. Reed also explained the RSVP:

---

[7]It appears that the full record of Dr. Reed's deposition, including exhibits, was filed with the trial court clerk on August 13, 2021, more than two weeks before the trial commenced. The State had previously filed a response to Hale's motion, with excerpts of Dr. Reed's deposition attached, on July 14, 2021. At the pretrial hearing on August 16, 2021, the trial court and both parties referenced the deposition—and Hale's counsel even said, "We have a copy of it here for the Court in case you'd like it." Because there is nothing in the record to indicate that the trial court read or considered the entire deposition, and because our analysis of Hale's first issue does not hinge on anything from Dr. Reed's deposition that was not included in the State's response, we will not consider Dr. Reed's deposition testimony beyond what was attached to the State's response to Hale's motion in our review of the trial court's ruling on Hale's motion.

[8]Dr. Reed also testified to these facts at the *Daubert/Kelly* hearing.

The RSVP is the Risk for Sexual Violence Protocol. It's just a set of professional guidelines used to assist or assess for risk of sexual offending. It's 22 risk factors, in different categories.

It's just a way of helping take into consideration some of the risk factors that aren't captured by the Static-99 or other actuarial measures.

At the *Daubert/Kelly* hearing, Dr. Reed testified that the updated norms for the Static-99 have been peer-reviewed and published. She explained how percentiles are generated by the Static-99, what those percentiles mean, and that they are based on data points. She testified that "you measure the Static-99" using "certain risk factors" but that "not all risk factors are taken into account by the Static-99." She also testified that there had been "statistical analyses on various risk factors," but she did not know "those numbers" offhand. However, she testified in greater detail about the Static-99 and how Hale's risk factors figured into her expert opinion:

So the Static-99 only has a certain number of risk factors that are included. Not every risk factor that a person could have can be included. So the Static-99 is just a snapshot of where he falls compared to other sex offenders on that measure that includes those particular risk factors.

. . . .

. . . . If there were other risk factors that are not listed or not items on the Static-99, they would not be included in my calculation of the Static-99. I don't alter the score. I don't change the score. I don't -- and it's recommended that you do not alter or change the score. It's just the scoring of those risk factors that are included on that measure for that individual.

There may be other risk factors that are not included on that measure, and they would be accounted for elsewhere. In my opinion, on the RSVP and a variety of other places. But they would not be included on the Static-99.

When asked if sexual deviance was a listed factor on the Static-99, Dr. Reed testified that the word "sexual deviance" is not an item, "but items that go to sexual deviance are." The trial court was well within its discretion to find that the sum total of this data provided a reliable basis for Dr. Reed's expert opinion.[9]

---

[9]Although Hale complains on appeal that Dr. Reed provided "no scientific support for her claim" that he is sexually deviant, it appears that at trial he challenged only her characterization of his offenses against A.S. as sexually deviant. He did not dispute that his first offense, committed against an eight-year-old child, was a "sexually deviant" act. Dr. Reed testified at the *Daubert/Kelly* hearing that she said Hale was sexually deviant based on more than just his offenses against A.S. She testified that whether an individual's sexual behavior goes outside of social norms is "part of" her determination as to sexual deviance. She explained that "sexually deviant behavior just means behavior of a sexual matter or a sexual matter that deviates significantly from the normal behavior." She gave "having sex . . . or having sexual contact with an eight-year-old or with an animal or a dead person" as examples of "sexually deviant acts." She also explained why Hale's actions with A.S. were sexually deviant:

> Again, she's underage. That's considered illegal. It was deviant in that he had this relationship with her. He's admitted to grooming her from the ages of 12 to 16. That's what makes that act sexually deviant.
>
> . . . .
>
> . . . . He discussed in his treatment notes grooming her -- giving her presents, giving her gifts, writing letters, things like that.
>
> . . . .
>
> . . . . There are numerous studies that involve the development of the adolescent brain, of the decision making of adolescents, that all speaks to what [Hale was] getting at and whether it's appropriate for an adult to have sex with somebody of that age, whether or not they can consent. I could not find a specific article that said it is sexually deviant for an adult to have sex with a 16-year-old, but there are numerous

15

Dr. Reed's testimony at her deposition and at the *Daubert/Kelly* hearing provides less support, though, for the trial court's implicit finding that her methodology was reliable. Although Dr. Reed testified in her deposition that she conducts her interviews "based on techniques that are commonly used and approved by the people that do those evaluations" in her profession and at the *Daubert/Kelly* hearing that her clinical assessment of Hale was "standard practice for these evaluations" in the United States, "this is simply the *ipse dixit* of the witness."[10] *Coble,*

---

publications that I've come across over the course of my education and my experience that talk about the decision-making abilities, the judgment, and why it's inappropriate. And the fact that it is illegal is because the legislature agreed that that was sexually deviant, that that was inappropriate.

Thus, Dr. Reed provided sufficient support for her claim that Hale was sexually deviant.

[10]We understand that a challenged expert witness's testimony is often the only evidence adduced at a *Daubert/Kelly* hearing to prove up the relevance and reliability of the expert's opinion. Such was the case here, and we do not mean to suggest that adherence to the principle that "it is not so simply because 'an expert says it is so,'" *Havner,* 953 S.W.2d 706, 712 (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 421 (5th Cir. 1987)), means that the prerequisites for admissibility of an expert opinion under Rule 702 cannot be established through the expert's testimony alone. What the rule requires is for the proponent of an expert's testimony to show a connection between the foundational, underlying data; the methodology used by the expert; and the expert's conclusions. *See TXI Transp. Co. v. Hughes*, 306 S.W.3d 230, 239 (Tex. 2010) ("Reliability may be demonstrated by the connection of the expert's theory to the underlying facts and data in the case."); *Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999) ("An expert's simple *ipse dixit* is insufficient to establish a matter; rather, the expert must explain the basis of his statements to link his conclusions to the facts."). Expert testimony is unreliable "if there is too great an analytical gap between the data on which the expert relies and the opinion offered." *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 349 (Tex. 2015) (quoting *Volkswagen of Am., Inc. v. Ramirez,*

330 S.W.3d at 277. An expert's bald assurance that her methodology was generally accepted and reasonably relied upon by other experts in the field is not sufficient to establish the reliability of the technique and theory underlying her opinion. *Robinson*, 923 S.W.2d at 559.

In determining whether a trial court abused its discretion, we generally consider only the evidence before the trial court when it made its ruling. *La. C Store Wholesaler, Inc. v. Royal Nett Apparel, LLC*, No. 02-17-00331-CV, 2018 WL 3059966, at *4 n.5 (Tex. App.—Fort Worth June 21, 2018, no pet.) (mem. op.). However, we also must uphold the trial court's evidentiary ruling if there is any legitimate basis for the ruling. *Malone*, 972 S.W.2d at 43. Here, the State elicited critical testimony from Dr. Reed after the trial court ruled her expert opinion and testimony admissible but before she offered her expert opinion to the jury. Dr. Reed testified that forensic psychology "has to do with the intersection of the law and in psychology." She then explained how she applied forensic psychology to this case:

> So what we do in forensic psychology is we take a legal issue, a legal question, in other words, a question by the court or a question posed by the legislature or the judge and try to apply the psychological principles that we've learned as psychologists to answering that question. So in this case the question is, ["]Does Mr. Hale have a behavioral abnormality?["] So I'm going to use what I understand about psychology and research in that particular field in psychology to try to answer that question.

---

159 S.W.3d 897, 904–05 (Tex. 2004)).

17

She explained in greater detail how she conducts a behavioral-abnormality evaluation, and she described how she learned her methodology during her Ph.D. program, her forensic fellowship, and her professional career. She testified that she utilized this methodology when she evaluated Hale and that it is the same methodology used by other evaluators who do these evaluations. She added that she followed the methodology because there was "no one test" to determine whether Hale had a behavioral abnormality, so she had to "put all of these little pieces of information together to come up with that answer."

Dr. Reed also detailed the different types of records she reviewed in this case and testified that those records are the same type of records that are typically reviewed and relied upon by experts in her field. She also explained why she relied on the facts and data contained in the records in forming the basis of her opinion:

> Again, the more pieces -- like we said, there's not a convenient one test where I can plug in some information and get an answer. It's about having to take as many data points and pieces of information as I can. So when I have all these records, that's just even more data points, more information to help me understand this person, to help me assess them on the measures that I use.
>
> In addition, you know, some of these offenses are for individuals maybe ten, 20 years, 30 years ago. And so a lot of times reviewing the original records is easier than kind of the pass-down records. In other words, what they're saying about it now may change versus what was going on back then, just because the nature of memory for one thing changes.

Finally, Dr. Reed testified that she evaluated Hale in accordance with her training as a psychologist and with the accepted standards in the field of forensic

18

psychology. This testimony from Dr. Reed distinguishes her methodology and opinion testimony from that of Dr. Coons in *Coble*:

> Dr. Coons forthrightly stated that "he does it his way" with his own methodology and has never gone back to see whether his prior predictions of future dangerousness have, in fact, been accurate. Although he had interviewed appellant before the first trial in 1990, Dr. Coons had lost his notes of that interview in a flood and apparently had no independent memory of that interview. He relied entirely upon the documentary materials given to him by the prosecution, including his 1989 report. Dr. Coons, therefore, did not perform any psychiatric assessment of appellant after his eighteen years of nonviolent behavior on death row, nor did he refer to any psychological testing that might have occurred in that time frame.

330 S.W.3d at 279. Unlike Dr. Coons, Dr. Reed based her expert testimony on historical *and* current information, including an interview of Hale she conducted less than five months before trial. She was able to testify in detail about what Hale said in their interview and how that informed her opinion. We therefore reject Hale's appellate contention that "Reed's testimony in this case should not have been admitted as it is similar enough to the erroneously admitted expert testimony at issue in *Coble*."

A trial court does not abuse its discretion if it commits a mere error in judgment. *See Robinson*, 923 S.W.2d at 558. While the State did not satisfy its burden of showing the scientific reliability of Dr. Reed's methodology at the *Daubert/Kelly* hearing, we cannot say the trial court reversibly erred because the trial court's ruling was ultimately, albeit belatedly, supported by the record. *See Malone*, 972 S.W.2d at 43; *In re Commitment of Pineda*, No. 02-20-00200-CV, 2021 WL 3796118, at *2 (Tex.

19

App.—Fort Worth Aug. 26, 2021, no pet.) (mem. op.). Put another way, the State ultimately established the reliability of Dr. Reed's methodology and sealed up the "analytical gap" between the data on which she relied and the opinion she offered.[11] We overrule Hale's first issue.

## C. The Trial Court Did Not Abuse Its Discretion in Denying Hale's Motion to Exclude Dr. Reed's Testimony as a Sanction for Discovery Violations.

In his second issue, Hale claims that the trial court erroneously denied his motion to exclude Dr. Reed's opinion testimony under the Texas Rules of Civil Procedure. On May 21, 2021, Hale served the State with his Notice of Intention to Take Telephone Deposition of Christine H. Reed, Ph.D. with Subpoena Duces Tecum. *See* Tex. R. Civ. P. 199.2(b). Pursuant to Texas Rules of Civil Procedure 195 and 199.2, Hale requested that Dr. Reed "produce and permit the inspection and copying of" certain documents and tangible things, including:

> 10. Any and all documents and tangible things including, but not limited to, all reports physical models, data, compilations of data, charts, graphs, videotapes, photographs, models, motion pictures, programs, and other material prepared or relied upon by [Dr. Reed] in forming any basis of h[er] opinion(s) or mental impressions in connection with this case.
>
> . . . .

---

[11]As the Court of Criminal Appeals put it when reviewing a trial court's ruling on a motion to suppress (the equivalent in a criminal case of a motion to exclude), "it would be unreasonable to ignore trial evidence in our review of the court's suppression decision only to be confronted by the evidence in our consideration of whether the error was harmless." *Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App. 1996).

13. A copy of any and all documents studied, reviewed or in any way relied upon by the deponent before or during the deposition for any portion of the opinions or the basis for the opinions to be expressed by the deponent.

14. A bibliography of each and every article, literature or textbook upon which [Dr. Reed] relied or to which [she] has referred in forming any of the opinions expressed or to be expressed by [Dr. Reed] regarding [Jack Hale Jr.], including without limitation, the title, the author, publisher's name, date of publication and journal.

15. A bibliography of each and every article, literature, treatise, or textbook which [Dr. Reed] relied on or to which [she] has referred to in forming her opinions regarding what risk factors for sexual recidivism she has identified for [Jack Hale Jr.].

During the deposition on June 10, 2021, Dr. Reed expressed her "professional opinion" that Hale's sexual assault of A.S. was "sexually deviant." When Hale's counsel asked Dr. Reed for "something that supports that position," she responded, "I don't have the name of a specific article I can point you to right now." After Hale's counsel stated that he "would appreciate that before trial," counsel for the State interceded and asked him to "narrow it down, some." Hale's counsel clarified that he was "just asking her for . . . what she used to form her professional opinion, that is peer-reviewed, and is used by her community." Counsel for the State assured Hale's counsel that he would "talk to Dr. Reed" and "try, to the best of [their] ability, to ascertain what it is [Hale was] asking for and respond to it." The deposition concluded without Dr. Reed or the State providing the requested information.

On July 7, 2021, Hale filed his motion to exclude Dr. Reed's testimony, alleging, "To date neither Petitioner nor Dr. Reed ha[s] provided the requested

21

information." In addition to challenging the reliability of her opinion testimony, Hale claimed that the State had violated Texas Rule of Civil Procedure 192.3(b) by failing to provide requested discovery. *See* Tex. R. Civ. P. 192.3(b) (requiring a person to produce a document or tangible thing that constitutes or contains matters relevant to the subject matter of the action and that is within the person's possession, custody, or control).[12] Specifically, Hale asserted that he had requested the State provide documentation in support of Dr. Reed's position and that such documentation had not been forthcoming. If information supporting Dr. Reed's position existed, Hale argued, then "a proper sanction for the failure to provide such information is that Dr. Reed be prohibited from testifying."

At trial, outside the presence of the jury, Dr. Reed acknowledged what was requested of her in the subpoena duces tecum. She testified that, "if there was a specific article that [she] used in this specific case," then she would have made Hale aware of that, but providing every book, treatise, manual, and article she had ever read would be difficult, if not impossible. Hale now argues that the only "just" remedy for

---

[12]We question Hale's reliance on Rule 192.3(b) here. By its plain language, Texas Rule of Civil Procedure 195 makes its permissible discovery tools the *exclusive* means by which a party may obtain information concerning testifying experts. *See* Tex. R. Civ. P. 195.1 ("A party may obtain information concerning testifying expert witnesses *only* through disclosure under this rule and through depositions and reports as permitted by this rule." (emphasis added)). There is no question, however, that Hale's deposition and subpoena duces tecum were permissible methods of testifying-expert discovery under the rules. *See* Tex. R. Civ. P. 195.3(a), 195.4, 199.2(b)(5).

22

Dr. Reed's failure to comply with his discovery requests would have been the exclusion of her testimony. We cannot agree.

Texas Rule of Civil Procedure 215.2(b) allows a trial court to sanction a party for failure to comply with a discovery request. Tex. R. Civ. P. 215.2(b). A trial court may strike the testimony of a noncompliant party's expert witness. *See* Tex. R. Civ. P. 215.2(b)(4) (authorizing a trial court to make an order refusing to allow the disobedient party to support designated claims or prohibiting the party from introducing designated matters in evidence); *State Farm Fire & Cas. Co. v. Rodriguez*, 88 S.W.3d 313, 326–27 (Tex. App.—San Antonio 2002, pet. denied), *abrogated on other grounds by Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20 (Tex. 2008). We review a trial court's award or denial of sanctions for an abuse of discretion. *Miller v. Walker*, 582 S.W.3d 300, 308 (Tex. App.—Fort Worth 2018, no pet.).

As the party seeking sanctions, Hale had the burden of establishing his right to relief. *GTE Communic'ns Sys. Corp. v. Tanner*, 856 S.W.2d 725, 729 (Tex. 1993). This included the burden to prove the assertions in his motion. *Id.* Here, Hale did not prove that Dr. Reed or the State failed to provide any additional documentation or other information that was responsive to his requests.[13] As we have already discussed,

---

[13]We note that Hale has not argued that he was surprised by any of Dr. Reed's testimony at trial or pointed to a specific document or tangible thing that was withheld from him and on which she relied in forming her opinions. *Cf. Rodriguez*, 88 S.W.3d at 323–27 (upholding trial court's striking of defense expert's testimony where expert testified at trial based on facts not previously disclosed to plaintiffs and used a PowerPoint presentation that had not been shown to plaintiffs despite

Dr. Reed explained the basis of her expert opinion at the hearing on Hale's motion. At the time he deposed Dr. Reed, Hale's counsel had the doctor's notes from her interview of Hale, which included detailed breakdowns of how she scored him on the RSVP, the Hare PCL-R, and the Static-99R. Hale failed to show that Dr. Reed had any further responsive documentation in her possession, custody, or control or even that such documents existed. A party cannot be sanctioned for failing to produce documents when there is no evidence that they exist. *See Chrysler Corp. v. Blackmon*, 841 S.W.2d 844, 850 (Tex. 1992).

Hale also alleged that Dr. Reed had provided "evasive or incomplete" answers during her deposition, "and such answers may be treated as a failure to answer." Hale is correct on the law but misapplies it to his case. For purposes of Rule 215.1, an evasive or incomplete answer is to be treated as a failure to answer. Tex. R. Civ. P. 215.1(c); *Horizon Health Corp. v. Acadia Healthcare Co., Inc.*, 520 S.W.3d 848, 884 (Tex. 2017). When a witness gives an evasive answer in a deposition, the proper sanction is to exclude the deposition. *Tex. & N.O. Ry. Co. v. Crowder*, 70 Tex. 222, 224, 7 S.W.

repeated requests). He argued in the trial court that he "must have the opportunity to respond to expert testimony properly and logically," but he has not shown how he was deprived of this opportunity. The trial court as much as encouraged Hale to cross-examine Dr. Reed about the matters he raised in his motion to exclude her testimony, telling him that "it sounds like there's a lot of . . . fertile ground for cross-examination, and that's certainly available." When ruling that Dr. Reed's testimony would be admissible before the jury, the trial court told Hale that he could "attack . . . her methods [and] her testimony through cross-examination." When Dr. Reed testified at trial, Hale never once objected that she was relying upon or testifying to facts that had not previously been disclosed to him.

24

709, 711 (1888). Hale did not move to exclude Dr. Reed's deposition from evidence; the only sanction he requested was the complete exclusion of her testimony.

Before sanctions can be imposed, there must be some evidence to show an abuse of discovery. *Glob. Servs., Inc. v. Bianchi*, 901 S.W.2d 934, 938 (Tex. 1995). Hale failed to prove up the assertions in his motion for sanctions and thus failed to establish his right to the relief he sought. Because Hale failed to meet his burden as the movant for sanctions, the trial court did not abuse its discretion in denying his motion for sanctions. We overrule Hale's second issue.

## IV.    EXCLUSION OF PAROLE EVIDENCE

In his third issue, Hale claims that the trial court erroneously excluded evidence that a Texas Department of Criminal Justice parole panel had approved him for release on parole "based on its legislatively required findings that Mr. Hale 'is able and willing to fulfill the obligations of a law-abiding citizen' and that Mr. Hale's release on parole is in the 'best interest of society.'" In his fourth issue, Hale claims that the trial court erred in excluding evidence of his conditions of parole. The State responds that the excluded evidence was irrelevant, and even if the trial court abused its discretion in excluding this evidence, any error was harmless. We agree with the State's harmlessness argument.

To obtain reversal of a judgment based on an error in the trial court, the appellant must show that the error occurred and that it probably caused rendition of an improper judgment or probably prevented the appellant from properly presenting

25

the case to this court. Tex. R. App. P. 44.1(a); *Romero v. KPH Consolidation, Inc.*, 166 S.W.3d 212, 225 (Tex. 2005). We will not reverse a trial court's judgment because of an erroneous evidentiary ruling unless the ruling probably, though not necessarily, caused the rendition of an improper judgment. *Gunn v. McCoy*, 554 S.W.3d 645, 668 (Tex. 2018); *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 136 (Tex. 2012). The complaining party must usually show that the whole case turned on the evidence at issue. *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001) (op. on reh'g); *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753–54 (Tex. 1995). If erroneously-excluded evidence was crucial to a key issue, then the error was likely harmful, but not conclusively or per se harmful. *Gunn*, 554 S.W.3d at 668. However, error in excluding evidence is likely harmless if the rest of the evidence was so one-sided that the error likely made no difference in the judgment. *Id.* "Likely" does not mean "definitely," and "we apply the same standard—whether the erroneous exclusion of evidence probably caused the rendition of an improper judgment—even when the excluded evidence related to a key issue." *Id.* at 668–69, 671; *JLG Trucking, LLC v. Garza*, 466 S.W.3d 157, 165 (Tex. 2015).

The party need not show that *but for* the erroneous exclusion of the evidence a different judgment would necessarily have been rendered, but only that the error "probably" resulted in an improper judgment. *Gunn*, 554 S.W.3d at 671. "This standard is less a precise measurement and more a matter of judgment." *Diamond*

26

*Offshore Servs. Ltd. v. Williams*, 542 S.W.3d 539, 551 (Tex. 2018); *see also Hughes*, 306 S.W.3d at 242–43.

We examine the entire record in determining harm. *Gunn*, 554 S.W.3d at 671; *U-Haul Int'l, Inc.*, 380 S.W.3d at 136. We evaluate the entire case from voir dire to closing argument, considering the evidence, the case's strengths and weaknesses, and the verdict. *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 236 (Tex. 2011). Here, Hale stipulated in his opening statement to the jury that he "has two convictions for sexually violent offenses under [the] Texas Health [and] Safety Code." Thus, the only contested element that the State had to prove was that Hale suffered from a behavioral abnormality that made him "likely to engage in a predatory act of sexual violence." *See* Tex. Health & Safety Code Ann. § 841.003(a)(2).

## A. Any Error in Excluding Evidence of the Parole Panel's Findings and Recommendation Was Harmless.

Hale directs our attention to Texas Government Code Section 508.141(e)(2), which provides, "A parole panel may release an inmate on parole only when . . . the parole panel believes that the inmate is able and willing to fulfill the obligations of a law-abiding citizen," and Section 508.141(f), which provides, "A parole panel may order a parole only for the best interest of society and not as an award of clemency." Tex. Gov't Code Ann. § 508.141(e)(2), (f). He argues that "a person cannot simultaneously be 'able and willing to fulfill the obligations of a law-abiding citizen' and also be 'likely to engage in a predatory act of se[x]ual violence.'" We disagree.

27

Again, "likely" does not mean "definitely." Further, a person's ability and willingness to do something is temporal and prone to change over time; it does not amount to a certainty that he will do it or equate to a quantifiable probability that he will or will not achieve it. We also note that Hale's offer of proof elicited the following testimony from Dr. Reed on the issue of whether or not Hale suffers from a behavioral abnormality:

> Q. Now, the Pardons -- Pardons & Paroles, they do this -- it is their job to make an assessment of an individual and certify that that person is safe to be released prior to placing him on parole; is that correct?
>
> A. They evaluate them for parole purposes, yes.
>
> Q. Yes. And in the case of sex offenders, they do make evaluations as to whether or not a sex offender is safe to be released into society, correct?
>
> A. They make an assessment, but it's not a behavioral abnormality assessment. They're not doing that kind of evaluation.
>
> Q. So you're saying that the behavioral abnormality assessment was not a determination as to whether or not an individual is likely to engage in predatory act of sexual violence?
>
> A. I'm saying they didn't do a behavioral abnormality evaluation.
>
> Q. A behavioral abnormality evaluation, if I'm correct, is making a determination as to whether or not an individual is likely to engage in a predatory act of sexual violence; is that correct?
>
> A. It's whether they have a behavioral abnormality that makes them likely to -- it's not one or the other. It's both. And they don't evaluate the individual in front of them for a behavioral abnormality. They don't do that. It's --
>
> Q. They don't --

28

A. They're different types of evaluations. They don't do that.

. . . .

Q. Okay. So does the State of Texas when -- the State of Texas, you would agree, when they're about to release a sex offender does an evaluation of risk with respect to whether or not the sex offender is going to be able to be successful in life and society? Would you agree with that, yes or no?

A. They do an assessment. I don't know the extent of the assessment. They don't use the same types of measures. They don't look at behavioral abnormalities.

. . . .

Q. So you don't know what -- and you're making it clear, you don't know what they do to evaluate?

A. I knew -- I know they don't evaluate for behavioral abnormalities. That is not the (inaudible/coughing) before the parole board, so they do not do an evaluation of a behavioral abnormality.

Q. So it is your position in that a behavioral abnormality evaluation is not risk assessment?

A. It's a type of risk assessment, a specific subset of risk assessments.

. . . .

Q. If the State of Texas makes a determination that he's not likely to reoffend, and you're making a determination as to whether or not he's likely to reoffend, which is what both of you are doing, how can you differentiate that?

A. Because I did an assessment of a behavioral abnormality using my psychological and forensic expertise, and they did an evaluation of risk for parole purposes. They're not the same thing.

Q. What do you think the purpose of that parole evaluation was, Doctor?

A. Not to establish whether he had a behavioral abnormality as outlined in the Texas Health and Safety Code.

Q. That wasn't the question, Doctor. The question was, what do you think the purpose of that parole evaluation was for?

A. To see if he was suitable for parole purposes.

Q. Okay. And what does that mean?

A. That they want to let him out on parole.

. . . .

Q. So then you do agree that Mr. Hale should be released on parole, correct?

A. It is my opinion that they did not do a behavioral abnormality assessment, and that he has been on parole. And previous times and --

. . . .

Q. It is your opinion that the State of Texas does not know what it's doing with respect to Pardons & Paroles, yes or no?

A. That is not what I said, no.

Q. Do you think they know what they're doing, Doctor, yes or no?

A. In this case, do I agree with letting him out on parole, no.

We fail to see how this testimony would have been helpful to Hale's case or how its exclusion caused the rendition of an improper judgment. Dr. Reed unwaveringly maintained that the Board of Pardons and Paroles did not assess or evaluate Hale for any behavioral abnormality. She explained the difference between her clinical assessment of Hale and the Board's evaluation of risk for parole purposes.

None of this evidence rebutted Dr. Reed's testimony that Hale suffered from a behavioral abnormality that made him likely to engage in a predatory act of sexual violence, nor did it negate an element of the State's case. We have recognized that civil commitment and parole are separate processes with separate purposes. *In re Commitment of Born*, No. 02-19-00272-CV, 2020 WL 6788213, at *7 (Tex. App.—Fort Worth Nov. 19, 2020, no pet.).[14] Further, our evaluation of the State's closing argument to the jury finds nothing misleading, such that the jury would be deceived by not knowing of the parole panel's findings and recommendation. Therefore, even if the evidence of the Board's parole decision was relevant and admissible, its exclusion was harmless. We overrule Hale's third issue.

## B. Any Error in Excluding Evidence of Hale's Current Parole Conditions Was Harmless.

Similarly, the record does not reflect that Hale was harmed by the exclusion of evidence of his parole conditions. Hale argues that the Texas Supreme Court decided in *Bohannan* that Chapter 841's "behavioral abnormality" definition does not require a "diagnosed mental disorder" because it is a "single, unified issue" that focuses on "increased risk" or "likelihood" of reoffending. 388 S.W.3d at 303 (quoting Tex.

---

[14]The State relies on *Born* and our sister court's decision in *In re Commitment of Evers*, 420 S.W.3d 81, 89 (Tex. App.—Beaumont 2012, pet. denied) (op. on reh'g), to support its argument that Hale's 2020 grant of parole was irrelevant. We do not hold today that the excluded parole evidence was relevant or irrelevant in this case, only that its exclusion was harmless.

31

Health & Safety Code § 841.003(a)(2)). Hale is correct, but this statement of law is exactly why his argument on this issue fails.

As we understand Hale's argument, the excluded evidence of his parole conditions was relevant to his likelihood to engage in a predatory act of sexual violence, not whether he suffers from a behavioral abnormality. Hale thus tries to bifurcate what the *Bohannon* Court called "a single, unified issue." *Id.* Under the plain language of Subsection 841.003(a)(2), as well as *Bohannon* and other cases interpreting it, the issue is whether a person's "*behavioral abnormality . . .* makes the person likely to engage in a predatory act of sexual violence." Tex. Health & Safety Code Ann. § 841.003(a)(2) (emphasis added). Hale's parole conditions might affect his likelihood of reoffending while he is on parole,[15] but they have no bearing on whether he suffers from a behavioral abnormality or not. Had the legislature intended to make a person's likelihood to engage in a predatory act of sexual violence a separate, predicate finding in a civil-commitment case, it could have amended the statute to do so. The statute as written focuses the factfinder's inquiry on whether the alleged SVP's "behavioral abnormality"—and nothing else—makes the person likely to reoffend.

Moreover, Hale does not explain how he was harmed by the exclusion of this evidence, other than to contend, "A jury could reasonably find that a person poses no

---

[15]Hale's argument also fails to address what would happen to his "likelihood of reoffending" once he discharges his parole and is no longer subject to the conditions he wanted to present to the jury.

such risk based on this person's parole conditions (i.e., the parole conditions are so restrictive as to amount to stranding a person on a deserted island in the middle of nowhere)." This contention suffers from the same flaw as the rest of Hale's parole-conditions argument: It attacks only part of the issue without addressing the essential behavioral-abnormality component. The jury charge contained the complete statutory definitions of "sexually violent predator" and "behavioral abnormality." Hale does not complain of any error in that charge, and we presume that the jury followed the trial court's instructions. *Faust v. BNSF Ry. Co.*, 337 S.W.3d 325, 337 (Tex. App.—Fort Worth 2011, pet. denied); *see also In re Commitment of Guest*, No. 02-19-00295-CV, 2021 WL 1245087, at *9 n.9 (Tex. App.—Fort Worth Apr. 1, 2021, pet. denied). Additionally, the jury heard evidence that Hale had previously been on parole with restrictions and had violated some of those restrictions. We therefore conclude that the evidence of Hale's current parole conditions would not have changed the jury's ultimate findings, and thus the exclusion of this evidence probably did not cause the rendition of an improper judgment. We overrule Hale's fourth issue.

## V.     CONCLUSION

Having overruled Hale's four issues, we affirm the trial court's order of civil commitment.

/s/ Mike Wallach
Mike Wallach
Justice

Delivered: March 2, 2023